THOMAS L. KARSTEN and MARILYN H. KARSTEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Karsten v. Commissioner
Docket No. 2026-73
United States Tax Court
T.C. Memo 1975-202; 1975 Tax Ct. Memo LEXIS 172; 34 T.C.M. (CCH) 868; T.C.M. (RIA) 750202; June 24, 1975, Filed *172 Hilbert P. Zarky, for the petitioners. H. Lloyd Nearing, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in the income taxes of petitioners: Year
Amount
1968
$ 3,409
1969
11,560 Various concessions having been made by the parties, only the following issues remain for our consideration: (1) Whether respondent erred in determining that Thomas L. Karsten received additional compensation during 1969 from the sale of his residence to his employer at cost; and (2) Whether respondent erred in disallowing in full petitioners' deductions for charitable contributions of property during the taxable years 1968 and 1969. FINDINGS OF FACT Some of the facts have been stipulated and these stipulations are adopted as a part of our findings. Petitioners, Thomas L. and Marilyn H. Karsten, are husband and wife and resided in Pacific Palisades, Calif., at the time of the filing of their petition with this Court. During the taxable years 1968 and 1969 they timely filed their joint income tax returns with Internal Revenue Service Center at Ogden, Utah. From 1953 *173 until sometime in 1968 Thomas L. Karsten (hereinafter Karsten or petitioner), an attorney, was employed by the American Trading and Production Corporation (hereinafter AT&P) in Baltimore, Md., as one of its principal executives. After initially dealing with matters involving litigation, Karsten concentrated his work in the field of real estate development. During the course of his activities on behalf of AT&P, Karsten had occasion to work with Charles Luckman (hereinafter Luckman) of Charles Luckman Associates, an architectural firm. In late 1967 or early 1968 Luckman advised Karsten that the architectural firm was being acquired by Ogden Corporation (hereinafter Ogden); that a new real estate development entity, Ogden Development Corporation (hereinafter ODC), would be formed as a subsidiary of Ogden with Luckman as president and chief executive officer; and that he would like Karsten to consider becoming the executive vice president. In April 1968 Karsten accepted this offer of employment. The position required petitioners to move from the Baltimore area to Los Angeles, Calif.
The employment agreement provided in pertinent part, as follows: 6. ODC will pay the moving and *174 travel expenses for you and your family, including your automobile and furniture, from Maryland to Los Angeles. In addition, we will, of course, work out with you a basis for paying your temporary living expenses for an appropriate period of time while you are here looking for a home to rent or buy. We understand, of course, that to some extent, your ability to purchase a home will be somewhat dependent upon your ability to sell your home which you have recently completed in Owings Mills, Maryland. In connection with the sale of that home, we understand you have an investment of approximately $80,000., and ODC agrees to reimburse you for any loss you incur if, in order to finally sell that house, you must do so on a basis less than your actual investment. To assist you in the purchase of a home in California, and on the assumption that it may cost you more here to attain your present standard of living in Owings Mills, ODC will make a loan up to $50,000; such loan to be paid off as convenient to you, but in any event, the loan is to mature five years after the date on which it is made. The interest will be at an appropriate rate. While Karsten was employed by AT&P, he resided with *175 his family in a house they owned located in Owings Mills, Md. (approximately 18 miles from Baltimore). The residence, designed by Marcel Breuer--a famous architect of modern design--was situated on a 2-1/4-acre lot on a knoll overlooking a valley and cost petitioners $86,036.84. Upon Karsten's decision to accept the ODC position, petitioners listed their Maryland residence for sale for $110,000. Not receiving any acceptable offers, petitioners reduced their asking price to $98,500 in June 1968. The unacceptable offers were for $50,000 and $65,000. Petitioners, still believing the residence to be worth at least cost and probably much more, attributed the lack of acceptable offers to general real estate market conditions and to the fact that the house, because of its modern design, had appeal to only a limited market. In July 1968 Karsten and his family moved to Los Angeles and purchased a residence in Pacific Palisades. Karsten borrowed $50,000 from ODC, pursuant to the employment agreement, to purchase the California residence. However, because of the financial burden of now owning two houses, Karsten approached Luckman with a view to having ODC acquire the Maryland residence at *176 his cost. The finalized proposal is partially set forth in the margin. [1]Ogden, the parent company, agreed to the proposal. *177 In late September or early October, while Karsten was negotiating with Luckman to have ODC purchase the residence, the asking price was lowered to $83,000, with a minimum acceptable price of $79,000. In January 1969 an offer was made by Mr. and Mrs. David M. Blum to purchase the Maryland residence for $72,500. This transaction was approved by Luckman, and on January 22, 1969, David Blum submitted a contract to purchase the Maryland residence for $72,500. The legal details of the sale were handled by Frank T. Gray, a Baltimore attorney. On January 21 or 22, 1969, Gray prepared a deed to effectuate the sale of the residence from the Karstens to ODC. The deed, backdated to January 2, 1969, transferring the property to ODC for $86,036, was transmitted to Karsten on January 23, 1969, along with copies of the sale contract between ODC and the Blums. The Blum sales contracts were sent for execution by ODC. The deed was backdated so that it would precede the date of the Blum contract. On February 13, 1969, this deed was recorded. ODC's first payments on the residence were made on February 26, 1969. These payments covered, among other items, the mortgage and utilities. The last mortgage *178 payment by ODC on the residence was made on March 13, 1969, and the last utility payment was made on April 30, 1969. As a consequence of the above transaction, ODC cancelled Karsten's liability on the $50,000 loan, assumed the liability on the mortgage on the Maryland property, and delivered to Karsten a note for $20,639.85. [2]
For the year 1969, ODC determined that it had a short-term capital loss of $18,155 [3] resulting from the sale of the residence to the Blums. *179 During the taxable years 1968 and 1969 petitioners claimed the following amounts as deductions for charitable contributions of property: Valued
for Item
Age
Condition
Contribution
1968
Salvation Army - Baltimore
Travertine Coffee Table
8 yrs.
Excellent
Noguchi Coffee Table
6-8 yrs.
Excellent
10 Herman Miller Dining
Room Chairs
10 yrs.
N/T [4]
2 Beds
10 yrs.
N/T
Bassinette
8-10 yrs.
N/T
2 Play Pens
8-10 yrs.
N/T
2 Garden Tractors
N/T
N/T
Miscellaneous Farm
Equipment
N/T
N/T
$1,400
Good Will Industries - Baltimore
6 Men's Suits
N/T [5]
N/T
2 Men's Winter Overcoats
N/T
N/T
4 Bags - Children's Clothes
N/T
N/T
3 Evening Dresses
N/T
N/T
1 Woman's Coat
N/T
N/T
2 Leather Jackets
N/T
N/T
12 Women's Dresses
N/T
N/T
$ 325
Reiss-David Child Study Center
2 Herman Miller Chests
N/T
Good
2 Danish Lounge Chairs
N/T
Good
1 Saarinen Womb Chair with
N/T
Good
Ottoman
1 Dining Room Table
N/T
N/T
8 Lamps
N/T
Varying
quality
3 V'Soske Custom Designed
and Woven Rugs
N/T
Good
1,510
$3,235
1969
Reiss-Davis Child Study Center
6 Men's Suits
N/T
N/T
4 Bags Children's Clothes
N/T
N/T
5 Dresses
N/T
N/T
Woman's Coat
N/T
N/T
Jacket
N/T
N/T
$ 210
Salvation Army
Washer and Dryer
N/T
Still
functioning
Draperies
N/T
Good
Hi-Fi System
N/T
Good
Portable Record Player
N/T
Good
Portable TV
N/T
N/T
Summer Furniture
N/T
Worn
850
$1,060
*180 Petitioners' valuations were determined by taking not more than 20 or 25 percent of the approximate purchase price of each item. OPINION The first issue is whether respondent erred in determining that petitioner received $18,155 in additional compensation for 1969 resulting from the disposition of the Maryland residence. Respondent submits that the transaction between petitioner and ODC, although in form a sale of the residence at petitioners' cost, was in substance a reimbursement to petitioner for the loss resulting from the sale of the residence to an independent third party and, therefore, is taxable to petitioner as additional compensation. Petitioners argue that the amount received from ODC was equal, if not less than, the fair market value of the property and that consequently there was no realization of income even though the property was ultimately sold at a loss. In our judgment, except for a minor adjustment, respondent made no error in this determination. When Karsten accepted employment with ODC, ODC agreed to reimburse the Karstens for any loss incurred resulting from the sale of *181 their Maryland residence. At the time petitioners listed their home for sale Karsten genuinely believed that the sale would result in a profit. However, after the purchase of their California residence, and the ensuing financial burden of owning two residences, Karsten sought to employ the "loss agreement" as leverage to persuade ODC to purchase the residence at his cost. Despite the fact that no acceptable offers had been received, Karsten still believed that if the property were held for a long enough period, a profitable sale could eventually be obtained. However, he did not want the continued burden of holding two residences. Although we have found petitioner to be a very sincere and credible individual, he has not persuaded us that the Maryland residence had a fair market value of $86,036 at the time it was transferred to ODC. The evidence seems quite clear that the transaction between petitioner and ODC resulting in the transfer was not an arm's-length transaction. The transfer price was set at petitioners' cost; there was no reference to fair market value. Petitioners allege that the cost was at least equal to the fair market value. The record, however, does not substantiate *182 such a claim. Petitioners seem to confuse future fair market value (a speculative estimate at best) with current fair market value. In short, petitioners have failed to meet their burden of proving the fair market value of the property at the time of transfer. It is our opinion that the fair market value of the residence at the time of transfer was $72,500. This finding is based on the Blum sale and the lack of contrary evidence presented by petitioners. Although it is clear that ODC did not intend to hold the property as an investment, it does not follow that the sale to the Blums was not a bona fide arm's-length transaction for the then current fair market value. It is our judgment, therefore, that since petitioners have failed to establish a fair market value greater than $72,500, the difference between this amount and $86,036 (i.e. $13,536) must be treated as additional compensation to Karsten. Cf. Seth E. Keener, Jr.,59 T.C. 302 (1972); William A. Lull,51 T.C. 841 (1969), affd. 434 F. 2d 615 (9th Cir. 1970); Harris W. Bradley,39 T.C. 652 (1963), affd. 324 F. 2d 610 (4th Cir. 1963). It is noted *183 that our figure $13,536 differs from the $18,155 respondent contends is taxable to petitioners. The difference is attributable to the sales commission and miscellaneous expenses paid by ODC in selling the property to the Blums. Unlike the factual findings in Seth E. Keener, Jr.,supra, we do not believe that the Blum sale was in substance a sale by petitioners. Consequently, these sale expenses are not attributable to petitioner. Compare Ernest A. Pederson,Jr.,46 T.C. 155 (1966), and Willis B. Ferebee,39 T.C. 801 (1963). The evidence seems clear that the decision to sell the residence at cost to ODC was made prior to the Blum offer and at a time when there were no outstanding offers. The fact that the actual transfer of the property by petitioners to ODC was almost simultaneous with the sale by ODC to the Blums is not particularly relevant in this instance with regard to who sold the residence. However, the price paid by the Blums is very relevant with respect to the fair market value of the property. The second issue presented is whether respondent erred in disallowing in full petitioners' deductions for charitable contributions *184 of property during the years 1968 and 1969. The evidence is uncontradicted that the items listed in our findings were actually contributed; the only question is their fair market value. [6]
Although we do not believe that petitioners have carried their burden of proving the fair market value of each item, it is our judgment that the total disallowance by respondent should not be sustained. As property of value was in fact contributed, petitioners should be entitled to some amount in the way of deductions. Cf. Cohan v. Commissioner,39 F. 2d 540, 543-544 (2d Cir. 1930). Employing our best judgment, but bearing most heavily against petitioner, "whose inexactitude is of his own making," we find that the following amounts should be deductible for petitioners' noncash charitable contributions: 1968
Amount
Salvation Army - Baltimore
$ 575 [7]
Goodwill Industries - Baltimore
325
Reiss-Davis Child Study Center
900 [7]
Total
$1,800
*185 1969
Amount
Reiss-Davis Child Study $210
Salvation Army
250
Total $460 With respect to the clothes donations, although there was no testimony as to condition or age, we have found petitioners' valuation reasonable. With respect to the other items we have allowed reduced amounts. Decision will be entered under Rule 155.
Footnotes
1. MEMORANDUM PERSONAL AND CONFIDENTIAL TO: Charles Luckman DATE: November 5, 1968 FROM: T. L. Karsten RE: Thomas L. Karsten Residence Caveswood Lane, Owings Mills, Md. The particulars in respect of my residence in Owings Mills, Maryland are as follows. The cost of the house (including land) was $86,000. Of this amount, slightly less than $16,000 is represented by the unamortized balance of the mortgage held by Provident Savings Bank of Baltimore. This mortgage carries interest of 4-1/2% per annum and will be fully amortized as of April 1, 1971. Thus, my equity in the house at this time is approximately $70,000. Our understanding is that ODC will reimburse me for any loss incurred if the house is sold on a basis less than my actual investment. What I am proposing is that ODC acquire the house from me now on the basis of my investment therein. ODC has advanced me $50,000 as a five-year loan to assist me in the purchase of my home in Pacific Palisades, and I have agreed to give ODC my personal note secured by a second mortgage on that property. If, instead of finalizing this transaction, ODC were to acquire my Owings Mills house, it would acquire fee simple title to that property in lieu of a second mortgage on the Pacific Palisades property. Its additional capital outlay would be approximately $20,000. The loan would be extinguished, and ODC would be in position to recoup its investment as soon as the Owings Mills house is sold.↩
2. February 6, 1969 FOR VALUE RECEIVED, the Undersigned promises to pay to the order of Thomas L. Karsten and Marilyn H. Karsten the sum of Twenty Thousand Six Hundred Thirty-nine Dollars and Eighty-five Cents ($20,639.85) payable without interest at the date of settlement of the sale of the property on Caveswood Lane, Owings Mills, Baltimore County, Maryland, to David and Margot Blum, pursuant to contract dated January 22, 1969, but in any event not later than sixty (60) days from date. Ogden Development Corporation By William Larkin Treasurer↩
3. The loss was determined as follows: ↩
Cost
$86,036
Sales commission
4,350
Misc. expenses
269
$90,655
LESS: Amount realized from
sale to Blum
72,500
Loss
$18,155
4. No testimony as to condition and/or age. ↩
5. See footnote 4, supra.↩
6. At trial respondent agreed that the only issue with respect to the contributions would be their fair market value, and that the other requirements of section 1.170A-1(a)(2), Income Tax Regs.↩, would not be argued as a basis for disallowance.
7. It is unclear from respondent's brief whether or not he has conceded these amounts. Although we do not necessarily approve of respondent's method, petitioners, in any event, are not entitled to a greater deduction and we believe these amounts to be reasonable.↩